**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Julie A. Su, *Acting Secretary of
Labor, U.S. Department of Labor*,

                         Plaintiff,

                                  Case No. 1:23-cv-4029-MLB

v.

Local 1700, Amalgamated Transit
Union, AFL-CIO,

                         Defendant.

_____/

## **ORDER**

In September 2023, Plaintiff Julie Su, acting Secretary of Labor, sued Defendant Local 1700, Amalgamated Transit Union, AFL-CIO. (Dkt. 1.)  The Secretary moved for summary judgment.  (Dkt. 30.)[1] Defendant responds.  (Dkt. 31.)  The Court denies the motion.

---

[1] Two introductory matters.  First, the Secretary originally moved for summary judgment in September 2024, and the Court orally granted the Secretary's Rule 56(e) motion and set a new briefing schedule. (Dkts. 21, 27.)  The Court therefore **DENIES AS MOOT** the Secretary's original motion. (Dkt. 21.)  Second, although the Secretary filed her reply brief an hour late, the Court retroactively granted a one-day extension. (Dkt. 35.)  So the Court considers the reply.

## I.    Background[2]

### A.    Defendant's Rules, Process, and Membership Tracking

Defendant Local 1700 is a union representing bus drivers and other employees of Greyhound Lines, Inc. in the United States and Canada. (Dkt. 31-6 ¶¶ 2, 9.)  Defendant is governed by the Constitution and general laws of Amalgamated Transit Union, AFL-CIO.  (Dkt. 32-1 ¶ 1.) It also has bylaws.  (*Id.* ¶ 2; 31-3.)  The Constitution and bylaws say that, to become a member of the union, a driver must (1) get hired by Greyhound, (2) submit a completed membership application, and (3) either pay the initiation fee and dues or authorize payroll deductions

---

[2] The Court uses the parties' facts as follows.  When a party does not dispute an asserted fact (or part of a fact), the Court accepts it.  When a party disputes an asserted fact, the Court reviews the record.  If the denial lacks merit, or someone improperly objects, the Court accepts the fact.  If an asserted fact is immaterial, a legal conclusion, or set forth only in one's brief, the Court excludes it.  The Court sometimes modifies an asserted fact to accommodate an objection when the record supports it. The Court also draws some facts directly from the cited evidence when needed for background.  *See* Fed. R. Civ. P. 56(c)(3).  Moreover, if a party cites a pleading, the Court considers the citations as evidence only if the opposing party admitted to the allegations.  *Cote v. Countrywide Home Loans, Inc.*, 2010 WL 11646975, at *2 n.2 (N.D. Ga. Feb. 11, 2010) (considering as facts, despite Local Rule 56.1, admissions made in pleadings when the answer shows a litigant's admission of facts), *adopted by* 2010 WL 11646985 (N.D. Ga. Mar. 31, 2010).  Finally, the Court only discusses the parties' most important objections.

for those expenses.  (Dkt. 32-1 ¶ 7.)  As part of the hiring process, a prospective driver must complete a one-week training class and a final road test.  (Dkt. 31-6 ¶ 13.)  If successful, Greyhound certifies the driver and assigns him or her to either a regular bus route or a spot on the so-called "extra board," a place where drivers pick up available routes. (*Id.* ¶ 14; 32-1 ¶ 8.)[3]  A driver is hired when Greyhound assigns the driver to the extra board or a regular route.  (Dkt. 32-1 ¶ 8.)

Defendant incentivizes early enrollment in the union, including by allowing potential employees who apply for membership at "driver training schools" to pay a lower initiation fee.  (Dkt. 31-6 ¶ 17.) Defendant's representatives attend these training sessions, talk to potential employees about the union, and distribute membership applications and forms allowing union dues to be deducted from members' paychecks.  (*Id.* ¶¶ 18–19.)  Defendant's representatives sometimes collect completed applications at those meetings and mail

---

[3] Neither party directs the Court to any evidence explaining the "extra board" in detail.  But the Secretary clarifies this point in her brief, so the Court uses that explanation.  (Dkt. 30-1 at 5.)

them to Sammie Howard, Defendant's Financial Secretary-Treasurer, for processing. (*Id.* ¶ 20; Dkt. 31-1 ¶ 1 (Howard's Declaration).)

This case involves something the parties refer to as the "new hire rule." Defendant explains that, under the rule, "a person who submits a completed membership application and dues authorization form to [Defendant] prior to their official employment by Greyhound will be considered a member in good standing, with the right to nominate candidates and cast a ballot, once they have been assigned to the [e]xtra [b]oard." (Dkt. 32-1 ¶ 10.) The Secretary agrees with this description. (*Id.*) But she also alleges that, under the new hire rule, "an individual [who] signs a membership card and dues authorization form prior to his or her official employment" becomes a member in good standing and has the right to vote once the person completes the new hire program and is assigned to the extra board. (Dkt. 31-6 ¶¶ 31–32.)[4] Defendant also agrees with this description. (*Id.*) The Secretary also claims that, under

---

[4] The parties implicitly agree the weeklong driving training and the new hire program mean the same thing. So the Court does as well. The parties also agree the new hire rule does not apply to employees who submit union membership applications *after* being hired. (Dkt. 32-1 ¶ 11.) Those people become union members once they pay their initiation fee. (*Id.*) The Court accepts that interpretation.

the new hire rule, "Greyhound bus drivers who apply for union membership during driver training become members in good standing, eligible to vote in Defendant's officer elections, on the date they appear on the extra board."  (*Id.* ¶ 32.)  And Defendant agrees with that, too. (*Id.*)

While these descriptions seem similar, there is a difference: verb choice.    Defendant says a prospective member must "submit" the application (and dues form).   In one instance, the Secretary says a prospective member must "sign" the application (and dues authorization form) and, in another instance, says the person must "apply."  The parties don't engage on these distinctions.  More on this later.

Greyhound sends Defendant two reports on a regular basis.  Most weeks, it sends a "driver file" that list all drivers, including new hires. (Dkts. 31-6 ¶ 23, 26–27; 31-1 ¶¶ 2, 26; 32-1 ¶ 17.)  The driver file identifies each driver's employment status as "A" for active, "T" for terminated, "L" for on leave, or "P" for pending employment.  (Dkt. 32-1 ¶ 19.)[5]  Every

---

[5] No one directs the Court to any evidence explaining how one's "pending employment" status fits within the new hire rule.  Perhaps this notation refers to one's probationary employment status, but no evidence backs that hunch.

month, Greyhound also sends Defendant an "employee change file," which identifies any change in employment status for all union employees.  (*Id.* ¶ 15; Dkt. 31-6 ¶ 25.)

Howard maintains and regularly updates Defendant's electronic membership database, called the Multi Union Membership System or "MUMS."  (Dkts. 31-1 ¶ 14, 17; 32-1 ¶ 12.)  It records each member's name, mailing address, and union status.  (Dkts. 32-1 ¶ 20.)[6]  Howard first uses the monthly employee change file to do this.  (*Id.* ¶ 21.)  Within seven days of receiving the report, he uses software known as AUTLink

---

[6] The Court pauses to address the Secretary's explanatory note to Defendant's enumerated fact as it illustrates a systemic problem with the record.  In the cited declaration, Howard said, "I regularly update MUMS using the information provided by Greyhound and other information received by the [u]nion in the regular course of business."  (Dkt. 31-1 ¶ 30.)  The Secretary does not dispute this fact but adds, without citing any evidence, that Howard's efforts to "regularly update MUMS" does not mean he "regularly adds new members." (Dkt. 32-1 ¶ 20.)  This argument highlights an evidentiary issue here: the absence of *any* depositions or other evidence to illuminate (or challenge) Defendant's assertion about what it does.  The parties rarely dispute one another's facts on this topic but rather argue about the meaning of written testimony or records. (*See, e.g.*, Dkt. 32-1 ¶¶ 24, 26, 28.)  In other words, they agree about the words used but disagree about the meaning of those words and provide no evidence to support their veiled disagreements.  The Court occasionally notes such ambiguities, but the parties should have ironed out those issues during discovery.  It makes summary judgment difficult.

to upload the new information into MUMS. (*Id.* ¶ 21.) AUTLink does it automatically. (*Id.*) Howard then manually reviews the updates for typographical and formatting errors. (*Id.* ¶¶ 22–23.) He then manually reviews the latest driver file to find any additional contact information for the new employees. (*Id.*) Howard does not upload driver files into MUMS because driver files are incompatible with ATULink and Defendant views them as less reliable. (*Id.* ¶¶ 27–28.)[7] Howard then reviews all pending membership applications he has received to determine whether Greyhound hired any of those prospective members. (*Id.* ¶ 24.) If a membership application corresponds with a newly hired prospective member, Howard updates MUMS with the applicant's information and "begins the process of enrolling [that person] as a

---

[7] The Court overrules the Secretary's partial, two-page objection to this evidence. In this objection, she says Howard's testimony on the driver file's lack of reliability is "not specific[,] not supported by the cited evidence," and immaterial to this motion since none of the supposed errors change one's eligibility to vote. (Dkt. 32-1 at 8–10.) The Secretary's first two grounds lack merit because Howard unequivocally explained why Defendant views these files as less reliable than employee change files. (Dkt. 31-1 ¶¶ 42–45.) The final ground is pure argument about when someone becomes an eligible voter.

member." (*Id.* ¶ 24.) This entire process usually takes Howard three working days. (Dkt. 31-1 ¶ 43.)

In addition to this, on the second and third Mondays of each month, Howard processes new member applications, ensures the prospective member completed the application, and confirms receipt by signing and dating the application in a space marked "initiation date." (Dkts. 32-1 ¶ 25; *Id.* ¶¶ 37–38.) He then consults the driver file to see whether Greyhound hired any of those prospective members and, if so, manually updates MUMS with that information. (Dkt. 32-1 ¶ 26.) Howard never said whether the phrase "manually updates" includes creating new member entries at this stage, and the Secretary never took his deposition or otherwise asked for that clarification. In any event, if Greyhound has not yet hired an applicant, Howard keeps his or her application for further review after he receives the next employee change file. (Dkt. 31-1 ¶ 41.)

### B. The December 2022 Election & the Secretary's Investigation

Defendant conducted an election by mail ballot on December 1, 2022. (Dkt. 31-6 ¶ 33.) In preparation for that election, Defendant mailed a combined election notice and nomination document to its

members in late September 2022.  (*Id.* ¶¶ 40, 46–47.)  The notice said Defendant would mail ballots to members on November 10, 2022 and collect submitted ballots by December 1, 2022.  (Dkts. 19-11; 31-6 ¶ 42.)  Defendant's election committee adopted election rules and shared them with candidates in late October 2022.  (Dkt. 31-6 ¶¶ 34–36.)  The rules noted Defendant would mail a ballot "to every person who is a member in good standing . . . as of October 31, 2022 (dues must be paid through October 31, 2022)."  (*Id.* ¶ 39.)

Defendant then began preparing to send out ballots, a complex process that includes detailed recordkeeping, coordination with election observers and officials, and assembly of ballot packages that include ballots, return envelopes, and postage.  (Dkts. 32-1 ¶ 35; 31-5 (describing the process).)  Defendant retained Hensley Company (an outside vendor) to address, assemble, and mail the ballots.  (Dkt. 32-1 ¶ 34.)  In the light of Defendant's November 10 mailing deadline, Hensley required Defendant to submit its mailing list by November 7, 2022.  (*Id.* ¶¶ 36–37.)

Defendant gave Hensley the list on October 27, 2022—5 days before it received the October 2022 employee change file that would have identified new union members, 11 days before Howard uploaded the file

to MUMS, and 11 days before Hensley's deadline.  (*Id.* ¶¶ 30–31, 38.) Neither party cites evidence to explain why Defendant sent the mailing list that early.  But Defendant suggests Howard didn't have time to upload and check the new information before the November 7 deadline. (Dkt. 31 at 22–23.)  Anyway, on November 10, 2022, Hensley mailed ballot packages to members who appeared on Defendant's membership list as of October 27, 2022 (that is, without updates to capture new members identified in the October 2022 employee change file).  (Dkts. 31-6 ¶¶ 52–53; 32-1 ¶ 41.)

Defendant received the November 2022 employee change file on November 30, 2022—the day before the election.  (Dkt. 32-1 ¶ 32.)  On election day, Defendant created a voter eligibility list to verify each voter's status as of December 1, 2022.  (Dkts. 31-6 ¶ 56; 29-2 at 15 ("voter eligibility list created on" this day).)  Howard did not process any information from the November 2022 employee change file before creating that list.  Consistent with his usual practice, he did not upload that file into MUMS until about a week later—days after the election. (Dkt. 32-1 ¶¶ 32–33.)  As a result, any newly hired employees identified in the monthly employee change file were not included on the December

10

list of eligible voters. Defendant only counted votes for members appearing on that list. (*Id.*¶ 62.)

After the election, several union members filed internal election protests. (Dkt. 31-6 ¶¶ 6–7.) The Secretary investigated and filed this suit, claiming Defendant violated the Labor-Management Reporting and Disclosure Act ("LMRDA"). (Dkt. 1.) She believes Defendant disenfranchised 64 voters by not allowing them to vote in the election. (Dkt. 31-6 ¶ 60 (citing Dkt. 29-16 (summary chart)).) That many voters would have been enough to change the outcome of each election. (Dkt. 32-1 ¶ 59 (outcome of every officer election).) She divides those supposedly eligible members into two overlapping groups: 52 people she says Defendant wrongfully excluded from Hensley's ballot list and 37 people she says Defendant wrongfully excluded from the final voter eligibility list. (Dkts. 31-6 ¶¶ 60–62; 29-16.) One of the Secretary's attorneys created a chart entitled "Summary of Members Improperly Omitted from Election" that the Secretary claims lists all the members Defendant improperly excluded from the election. (Dkts. 29 ¶ 7; 29-16.)[8]

---

[8] Oddly, the summary chart labels one column as those who "met [the] eligibility criteria by 11/21/2022 but [were] not added to voter eligibility

That attorney filed an affidavit explaining he created the chart from information obtained during discovery. (Dkt. 29-16 ¶ 8.) Citing record evidence, the summary chart lists each supposedly disenfranchised voter, when the person signed his or her membership application, when Greyhound hired each person, and when Howard signed and dated each membership application in the "initiation" space. (*Id.*) It also includes explanations Defendant provided in written discovery responses about why it excluded some of the people. (*Id.*) Defendant, for example, allegedly said it received membership applications for two of those people after November 10, 2022—thus after Hesley's cutoff date for the list of eligible members. (*Id.* (citing Dkt. 29-2).) Defendant also explains it received the notice of hiring from Greyhound for 30 of those people on or after November 30, 2022—the day before the election. (*Id.* (citing Dkt. 29-2).) Defendant did not provide an explanation for the remaining 32

---

list." (Dkt. 29-16.) The Court has no idea where the Secretary got that deadline from. The summary chart's underlying affidavit says this column "identifies whether [Defendant] failed to include the member on the list of eligible voters used on December 1, 2022." (Dkt. 29 ¶ 8(i).) That December 2022 deadline aligns with the evidence in this case. The Court chalks this discrepancy up to a typo (or some other immaterial reason) and views the column to refer to the December 2022 deadline.

members but rather objected to having to do so as beyond the scope of permissible discovery. The Secretary did not seek to compel a response.[9]

## II.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The non-moving party then has the burden of showing summary judgment is improper by coming forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, "[w]here

---

[9] In the "Union's Explanation" column of the summary chart, the Secretary marks Defendant's explanation for the remaining 32 members as "[n]one." (Dkt. 29-16.) Juxtaposed with Defendant's two affirmative explanations for excluding the other members, one could believe Defendant answered something like "it has no explanation" for these members. That would be a mistake. As explained above, Defendant objected to the Secretary's multipart interrogatories on the grounds they exceed the permitted number of interrogatories and responded "subject to" that objection. (Dkt. 29-2.) To avoid the faulty impression that Defendant had no explanation, the Court rephrases the explanation.

13

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021).

## III.   Discussion

### A.    Threshold Issue: The Summary Chart

Before addressing the merits, the Court resolves a threshold issue regarding the summary chart.  In both its response to the Secretary's statement of material facts and its brief, Defendant objects to factual assertions for which the Secretary cites the summary chart.  (Dkts. 31-6 ¶¶ 60–61; 31 at 11–17.)   It mainly argues this summary chart misrepresents the evidence (for example, by concluding a driver file provided "notice" of an employee's hiring or by misrepresenting the employment status of several drivers), and contains inadmissible hearsay (for example, employee change files, driver files, and union membership applications) for which the Secretary offers inadequate foundation.   (*Id.*; *Id.*)   On the latter, Defendant specifically attacks unsworn business record certifications by Brandy Smith and Trimika Singleton, two employees of Greyhound (or an affiliate) with personal knowledge of the company's business records.  (Dkt. 31-6 ¶¶ 60–61 (citing

14

Dkts. 28-6 & 28-9).)  The Secretary argues the Court may consider this hearsay since it fits within an exception—Fed. R. Evid. 803(6) and the two employees' certifications are self-authenticating under Fed. R. Evid. 902(11).  (Dkt. 32 at 3–4.)

The Court agrees in part with both parties.  On the one hand, the Court agrees with Defendant that the summary chart misconstrues some of the evidence.  The Court discusses those issue below.  And the chart's notation of whether someone was in good standing as of the relevant date or denied the right to vote are legal conclusions, so the Court doesn't consider them.  LR 56.1(B)(1), NDGa ("The Court will not consider any fact . . . stated as an issue or legal conclusion."); *Reese v. Herbert*, 527 F.3d 1253, 1268–69 (11th Cir. 2008) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").  On the other hand, the Court agrees with the Secretary that it may consider all the underlying documents and the summary chart as evidence, at least to the extent it comports with the underlying data.  Though the parties devote substantial space to arguing whether the data presently fits within the hearsay exception, none of that really matters.  Courts may consider hearsay evidence "if [] [it] could be

15

reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (internal quotation marks and citation omitted).  The Court concludes Smith, Singleton, and a paralegal for the Secretary could testify at trial and (likely) provide a basis for admission of all relevant documents under either Rule 803(6) or 1006 of the Federal Rules of Evidence.  And on the summary chart itself, even if Defendant was right, the chart "is not meant to be evidence but rather to provide a single location where all the relevant evidence is collected."  (Dkts. 29 ¶ 7; 30-1 at 13 n.4.)  So the Court would still cite the summary chart as a collection of otherwise admissible record evidence.

## B.   Merits

The LMRDA insures "free and democratic" union elections.  *Wirtz v. Hotel, Motel & Club Emp. Union, Loc. 6*, 391 U.S. 492, 496 (1968). To succeed under the LMRDA, the Secretary must demonstrate (1) the "union's conduct constitutes a statutory violation, and (2) that the violation 'may have affected' the outcome of the election." *Hugler v. Loc. 689, Amal. Transit Union*, 266 F. Supp. 3d 855, 861 (D. Md. 2017); *Chao v. Loc. 54, Hotel Emps. & Rest. Emps. Int'l Union,* 166 F. Supp. 2d 109,

112–113 (D.N.J. 2001).  Success under the first prong creates a rebuttable presumption of success on the second prong.  *Wirtz*, 391 U.S. at 506–07. If the Secretary proves both prongs, the Court must set aside the election results.  29 U.S.C. § 482(c)(2).

Section 481(e) guarantees "every member in good standing . . . the right to vote for . . . the candidate of his [or her] choice."  29 U.S.C. § 481(e).  Courts have interpreted this language to require unions to take "reasonable steps" to secure the franchise for members in good standing. *Loc. 54*, 166 F. Supp. 2d at 120 (collecting cases).[10]  Section 481(e), however, does not demand "perfection" and involves a fact-intensive inquiry.  *Marshall v. Am. Postal Workers Union*, 486 F. Supp. 79, 83 (D.D.C. 1980) (acknowledging "it would be unreasonable to construe the statute as requiring perfection").  Some courts, for instance, "may look to the existence of alternative actions that could have been taken by the union."  *Perez v. Amal. Transit Union Loc. 1700*, 174 F. Supp. 3d 395, 403

---

[10] Neither party has produced—nor has the Court found—any binding precedent stating this interpretation.  Although the Eleventh Circuit has not adopted any construction of this provision, both parties use it. (Dkts. 30-1 at 19; 31 at 19.)  For purposes of this case only, the Court adopts this interpretation.

(D.D.C. 2016). Others have considered the feasibility of implementing these actions. *Am. Postal Workers Union*, 486 F. Supp. at 83 ("There is no indication that the administrative problems mentioned are insuperable[.]").

The Secretary moves for summary judgment on her final two counts: Counts Two and Three. (Dkt. 30.) Count Two alleges "Defendant deprived new members of the right to vote in violation of . . . 29 U.S.C. § 481(e) [] when it failed to mail the ballots to at least [52] individuals who became members in good standing prior to the ballot mailing on November 10, 2022." (Dkt. 1 ¶ 92.) Count Three alleges Defendant "further deprived new members of the right to vote in violation of . . . 29 U.S.C. § 481(e) [] when it failed to add at least [37] individuals who were members in good standing as of December 1, 2022, to the voter eligibility list used at the ballot tally." (*Id.* ¶ 94.)[11]

---

[11] The Secretary initially alleged Defendant denied the right to vote to "at least 60 individuals" under Count Two and "at least 42 individuals" under Count Three. (Dkt. 1 ¶¶ 89, 94.) She thus alleged Defendant disenfranchised "72 unique members." (*Id.* ¶ 85.) The Secretary, however, whittled down the total number of voters to 64 for various reasons. (Dkt. 30-1 at 16 n.6.) She now moves for summary judgment, saying Defendant disenfranchised 64 unique members. (*Id.* at 16–18.) The Court thus addresses only those members.

The Secretary believes summary judgment is proper on both counts. (Dkt. 30-1.)  She first argues Defendant did not take the reasonable step of sending 52 eligible members a ballot, thereby denying them the right to vote under Count Two.  (*Id.* at 19–24.)  The Secretary next argues Defendant failed to take the "necessary step" of placing 37 members in good standing on the eligible voter list, thus denying such members the right to vote under Count Three.  (*Id.* at 24–27.)

At the outset, the Court disagrees with the Secretary's framing of the issue.  The Secretary's argument skips right to the end and collapses the entire analysis into one step, saying Defendant's failure to send a member a ballot or to include a member on the voter list is a violation of the law.  Sort of like strict liability.  But the issue is whether Defendant took reasonable steps to determine who should receive a ballot and be on the lists.  The cases the Secretary cites make this point clear.  In *Loc. 1700*, for example, the court identified the issue as whether the union took "reasonable steps to maintain current mailing addresses for its members and to distribute election ballots to all those entitled to vote." 174 F. Supp. 3d at 404.  Similarly, in *Donovan v. Loc. 10902 Commc'ns Workers of Am.*, 650 F.2d 799 (5th Cir. 1981), the court criticized the

19

union for failing to use a mailing list that its bylaws required it to use, an obviously unreasonable practice. *Id.* at 800–01. Finally, in *Am. Postal Workers Union*, the court recognized "it would be unreasonable to construe the statute as requiring perfection" but found a violation because "the defendant simply [had] not demonstrated that it [had] made adequate efforts to ensure the fairness of the elections" because "[t]here [was] no indication that the administrative problems mentioned are insuperable, and the problem of delay in recognizing new members appears particularly amenable to improvement." 486 F. Supp. at 83.

The Court need not go further into this issue because disputed facts prevent this Court from concluding whether Defendant excluded eligible voters by not sending them a ballot or omitting them from the voter roll. Because both counts arise from the same purported misconduct in not updating properly each list, the Court discusses the two counts jointly.

> **1.  The Secretary has not shown the absence of material factual disputes as to whether Defendant denied the members on the chart the right to vote.**

The Secretary's primary allegation is that listed members on the chart were eligible to vote by November 7 (the day Hensley prepared the ballots) or December 1 (election day). The Secretary bases this contention

20

on its interpretation of the new hire rule, construing it to argue each listed member became eligible to vote at the later of when the person *signs* their membership application or "has successfully completed the company's new hire program and has been assigned to the [e]xtra [b]oard." (*E.g.*, Dkts. 31-6 ¶¶ 31–32; 32 at 7; 29 ¶ 8(k) ("[T]he Secretary's position is that a member is eligible to vote once he or she signs a membership card and is hired by Greyhound—that is, the later of [two columns in the summary chart].").)  So, according to the Secretary, because the listed members always *signed* the application before Greyhound hired them, "the hiring date, then, is the most important date." (Dkt. 32 at 8.)[12]  In other words, the Secretary contends the drivers listed in its chart became union members on the day Greyhound hired them, regardless of whether Defendant had received their applications and dues authorization.  The Secretary thus believes there is no dispute that Defendant improperly prevented these members from voting.

---

[12] One of the employees included in the list, Raymond Paradise, signed his application after the date on which Greyhound hired him. (Dkt. 29-16.)  Defendant provides no indication why he was not included on the lists.  The Court merely notes that his eligibility to vote does not depend on the Secretary's interpretation of the new hire rule.

21

As explained above, Defendant (producing Howard's declaration) states the rule differently, saying a prospective member "who *submits* a completed membership application and dues authorization form to the union prior to their official employment by Greyhound will be considered a member in good standing." (Dkt. 31-1 ¶ 12 (emphasis added).) Defendant says the Secretary incorrectly assumes someone hired by Greyhound "could become eligible to vote by simply signing an application, even if he or she never delivers it to the [u]nion." (Dkt. 31 at 16.) And because the Secretary presents no evidence as to when the listed members submitted their membership applications, it says the Secretary has not shown when each of those members became eligible to vote. (Dkt. 31 at 15–16, 18.) Defendant thus posits the Secretary has not shown it improperly omitted these listed members. (*Id.* at 18.) The Court agrees with Defendant.

The Secretary's construction of the new hire rule is inconsistent with the language in Defendant's Constitution. The Constitution generally requires a prospective member to "fill out the regular application[,] . . . sign the same[,] . . . [and] present[] [it] with the initiation fee." (Dkt. 31-2 at 43 § 21.3.) It says a person becomes a

22

member in good standing after he or she has "*submitted* an application." (*Id.* at 44 § 21.6 (emphasis added).)   The Constitution doesn't define "submitted," but it means "to present or propose to another for review, consideration, or decision; also to deliver formally."   "Submit," Merriam-Webster                   Dictionary,                   https://www.merriam-webster.com/dictionary/submit (last visited June 19, 2025).   In this sense, signing an application is part of the process, but one must then submit the application to complete the enrollment process.   Taken together, these terms require some affirmative delivery or presentment to Defendant of the signed application.

The same must be true under the new hire rule.   And it makes common sense.   After all, how could Defendant know whether a listed member "sign[ed]" the "membership card and dues authorization form" without some delivery?   (Dkt. 31-6 ¶ 31.)   Any assertion to the contrary is, as Defendant puts it, "absurd," and would make Defendant's tracking efforts impossible.   (Dkt. 31 at 16.)

In support of her interpretation of the new hire rule, the Secretary cites a 2007 letter in which the (then) president of the union explained:

> Unique considerations come into play, of course, where membership cards are obtained from individuals prior to their

23

> formal employment as we understand is typically the case at Greyhound. For purposes of Local 1700 officer elections, an individual that signs a membership card and dues authorization form prior to his or her official employment by Greyhound will be considered a member in good standing, with the right to nominate candidates, and cast a ballot, once the individual in question has successfully completed the company's new hire program and has been assigned to the Extra Board."

(Dkts. 30-1 at 6-7; 31-6 ¶ 31.)  And the Eleventh Circuit has explained that "a court must accept the interpretation placed on the constitution by the union if that interpretation is fair and reasonable." *Reich v. Int'l All. of Theatrical Stage Emps. & Moving Picture Mach. Operators of U.S. & Can.*, 32 F.3d 512, 515 (11th Cir. 1994).  The letter does not help the Secretary for two reasons.  First, no evidence shows how frequently the union applied this rule.  Was it a one-time statement from the former president or an on-going position?  Second, the Secretary fails to engage with the first sentence of the letter—noting the new hire rule only "come[s] into play . . . where membership cards are *obtained* from individuals prior to their formal employment." (Dkt. 31-6 ¶ 31 (emphasis added).)  "Obtain" primarily means "[t]o bring into one's own possession." Obtain, Black's Law Dictionary (12th ed. 2024).  The former president's explanation of the new hire rule, therefore, contemplates some delivery

24

of the membership card (or application) to Defendant by a prospective member.

Perhaps realizing this issue, the Secretary says her interpretation makes good sense "in light of the way the [u]nion obtained signed applications from prospective members." (Dkt. 32 at 7.) She says, "the listed members did not take the applications home and mail them to the [u]nion weeks later," as Defendant envisions. (*Id.*) Rather, the Secretary, citing the answer to the complaint, argues Defendant's representatives approached the listed members at the trainings, distributed the membership applications, and "collected the signed applications to mail to the [u]nion office." (*Id.*) "All that remained," according to the Secretary, "for these potential members to become 'members in good standing' was to be hired by Greyhound." (*Id.*)

Of course, this argument tacitly concedes the new hire rule requires *some* submission of the application to Defendant. In other words, the Secretary's construction avoids this absurdity by recognizing the listed members *submit* applications *directly* to representatives at the trainings. Still, the Secretary's belief that Defendant's representatives always (or at least often) collect these applications at trainings lacks any connection

to the evidence.  Indeed, the cited evidence—Defendant's admission in its answer—only reveals that "representatives *sometimes* collect completed membership applications [at the training] and mail them to [its] financial secretary-treasurer."  (Dkt. 8 ¶ 32 (emphasis added).)  Sometimes the representatives collect them but not always.  Because of this ambiguity, the Secretary has not shown which, if any, of the listed members on the chart submitted their applications during training.  Indeed, she has not shown that any of those members did that.

Second, and with that in mind, the Secretary has presented no evidence indicating when each listed member *submitted* the application to Defendant, much less evidence they did so by the relevant deadlines. Her only evidence somewhat suggesting when Defendant *received* the applications comes from the "initiation date" in which Howard signed and dated the membership applications.  But this evidence hurts, not helps, the Secretary.  As Defendant correctly notes, nearly "every initiation date" for the at-issue members "falls *after* the date [] [the Secretary] claims the individual became" an eligible voter. (Dkts. 31 at 16 (emphasis in original).)  Similarly, Defendant recorded an initiation date after the deadlines for mailing ballots and voting for 57 of the 64 employees on the

26

Secretary's chart. (*See* Dkt. 29-16.) Defendant recorded initiation dates before the deadlines for only four employees (Terry Allen, Ricardo Loya Ortiz, James Murray, Adam Koecke) and recorded no initiation date for three others (Shane Clement, Daynon Martin, and David Sweat).[13] (*Id.*) According to the Secretary, Defendant says it did not receive notice that Greyhound hired Clement, Martin, and Sweat until November 30—after the relevant deadlines. (*Id.*) The record contains no evidence as to Defendant's explanation for the other four employees as Defendant objected to providing that information, and the Secretary did not move to compel. (*Id.*) The Court does not confuse the absence of an explanation with an admission that these employees were eligible for membership before the deadlines. This is particularly important because the parties

---

[13] The initial date for Adam Koecke falls after the deadline for mailing the ballot but before election day. (Dkt. 29-16.) The Secretary also makes much of the fact she found applications for the three employees without initiation dates in an unopened envelope during her investigation. (Dkts. 30-1 at 14–15; 32 at 9.) Defendant asks the Court to disregard this fact because the Secretary never included it in her statement of material facts. (Dkt. 31 at 10.) The Secretary has no meaningful response to this argument. Because the Secretary failed to include this fact in her statement of material facts contrary to Local Rule 56.1(B), the Court does not consider it. And, even if it did, it is unclear how this fact would impact the analysis. In the light of other evidence (or at least some explanation or context), it certainly does not suggest a violation of the law by itself.

27

took no depositions to understand the process and do not engage with these issues in their briefs.

To be clear, this discussion does not confirm the initiation date evidence definitively establishes when the listed member *submitted* the application. Some daylight exists between the time someone submits an application and when Defendant receives it—allegedly the "initiation date." And Howard reviews applications and records the "initiation" on the second and third Mondays of each month, meaning they may sit in his office for some time before being reviewed. (Dkt. 32-1 ¶ 25.) But viewed in the light most favorable to Defendant (the non-movant), a reasonable factfinder could find that evidence of when Howard "initiated" the application a crude indicator of such submission. Or such factfinder could conclude the absence of such submission evidence supports Defendant's decision to await regular files before processing new member applications, as discussed below. Either way, without such evidence, a factfinder is left to speculate precisely when each of the 64 members became eligible to vote.[14] And certainly the failure of the Secretary's

---

[14] The Secretary notes in passing that Defendant "did not keep records of when its representatives mailed applications to the [u]nion or when the

thesis that all a prospective member must do is sign an application means the Secretary has failed to show—beyond any factual dispute—that Defendant denied these members their rights to vote.

### 2. Even if the Secretary somehow carried her initial burden, the Court couldn't grant this motion.

Putting aside the previously discussed issue, the Secretary insists the "undisputed facts" show Defendant failed to take "reasonable steps" to secure the purported members' right to vote. (Dkt. 30-1.) According to the Secretary, both counts really boil down to Defendant's "failure to maintain and use an updated membership list when mailing ballots" and assembling the voter eligibility list. (*Id.* at 24.) In response, Defendant asserts the claims must survive summary judgment because genuine issues of fact exist about the reasonableness of its procedures, and the Secretary hasn't shown it acted unreasonably as a matter of law. (Dkt.

---

applications were opened in the [u]nion office," allegedly violating its statutory duty. (Dkt. 32 at 8.) This case does not allege such a violation, and the lack of records creates an evidentiary problem for the Secretary in showing when Defendant received applications.

31 at 19–24.)  Defendant has the better argument.

Defendant has shown the existence of a genuine issue of material fact regarding the reasonableness of Howard's measured process. Howard testified he processes new members three times a month: once at the beginning of the month using the employee change file and two more times on the second and third weeks of that month.  (Dkt. 32-1 ¶¶ 15, 25.)  Howard first uploads the employee change file—Greyhound's official employment records—to MUMS within seven business days, corrects informational errors using the driver file of newly added employees, and, after cross-referencing each pending membership application, updates MUMS with the applicant's information and begins the enrollment process for that member.  (*Id.* ¶¶ 15, 21–22, 24.)  Once that's completed, he typically processes new member applications two more times (on the second and third Mondays of each month), reviews new member applications for completion, and signs and dates them in the "initiation" space.  (*Id.* ¶ 26.)  All the while, no evidence suggests Howard had any notice of members improperly omitted, at least from a source it viewed reliable. *Cf. Loc. 1700*, 174 F. Supp. 3d at 403 (finding irrelevant this union's precise mailing list efforts when it learned of

30

undeliverable ballots but took little to no steps to remedy it).   A factfinder, therefore, could view the regularity of these efforts sufficiently designed to capture new members hired between employee change files and to update the list.

What's more, the evidence, viewed most favorably to Defendant, suggests Howard faithfully followed that process here.   Howard, for instance, received the October 2022 employee change file on November 1, 2022 and, consistent with his customary practice, uploaded it into MUMS on November 7, 2022.  (Dkt. 32-1 ¶¶ 30–31.)  By that time, Defendant had already sent the ballot mailing list to Hensley.  (*Id.* ¶¶ 37–38.)[15] Consistent with Howard's practice that he processes new member applications twice more per month, Howard appears to have rigorously

---

[15] Critically, the Secretary does not dispute the reasonableness of Defendant generally implementing a cutoff date for new members to receive ballots. (Dkt. 30-1 at 23.)  Instead, the Secretary, mostly in her reply brief, says Defendant disregarded "its own procedures by using an October 27 cutoff date for printing and mailing ballots," despite setting an internal deadline of November 10. (Dkt. 32 at 14–15.)  Fair enough. But that alleged misstep is too insufficiently fleshed out to warrant much consideration.   Nor is this other supposed violation material to this motion, as the Secretary acknowledges.  (*See* Dkt. 30-1 at 24 ("The issue is not the existence of a cut-off date but rather the [u]nion's failure to maintain and use an updated membership list when mailing ballots on that cut-off date.").)

done so, as the summary chart shows all initiation dates fell on either the second or third Monday of each relevant month.  (Dkt. 29-16.)  And, of course, he received the November 2022 employee change file only one day before the December 1, 2022 eligibility deadline—leaving him only that day to perform his normal three-day process.  So the evidence indicates Howard faithfully applied his customary practice of updating the membership list.

The Secretary insists this process is unreasonable as a matter of law.  Her argument focuses on the delay between the time Defendant allegedly received notice Greyhound hired each member through the driver file and when Defendant added each member to the respective list.  (*See, e.g.*, Dkt. 30-1 at 16–18 (contrasting Defendant's explanation for omitting such member with the date the member appeared on a driver file).)  Defendant responds that the Secretary has not shown it acted unreasonably as a matter of law, particularly in the light of the supposed unreliability of the driver file.  (Dkt. 31 at 21–24.)

At its core, the Secretary's argument arises from three tenets. First, a listed member becomes eligible to vote at the later of his or her signing of the application and the precise hire date on the employee

change file, regardless of when Defendant receives the file.  Second, Defendant should have used the driver file to "confirm" the hire date for new members and it was unreasonable (as a matter of law) for it not to do so.  Third, by failing to recognize a member's hire date listed on the driver file, substantial delays arose between the time the person became eligible to vote and the time Defendant added them to the membership list.

Genuine issues of material fact, however, undermine each tenet. First, because the new hire rule contemplates some submission of applications (and there's no evidence about that), a factfinder must speculate when someone became a member in good standing.  So a reasonable factfinder couldn't quantify or assess the alleged "long delay between when the applications were *submitted* during training and when [] Howard actually processed them."  (Dkt. 32 at 11 (emphasis added).) Nor could such factfinder decide whether "any subsequent delays in transmitting and processing [] applications" fell "within the control of the [u]nion" without this evidence.  (Dkt. 30-1 at 22.)

Second, the Court cannot say Defendant should've used the driver files as a matter of law when updating the entire database (or said

33

differently, that it was unreasonable as a matter of law not to do so). Defendant has produced evidence—Howard's declaration—mentioning plenty of sound reasons it doesn't rely on those files to update its entire database. For one, the driver files are incompatible with ATULink, so Howard must create or update those entries manually. (Dkt. 32-1 ¶ 27.) For another thing, Howard testified the driver files—assembled from information Greyhound's various operational managers provided—lack the same degree of reliability as the employee change files—Greyhound's official employment records maintained by its Human Resources Department—and often contain errors or information not matching the employee change file. (Dkt. 32-1 ¶¶ 16, 18, 28.)

Defendant, for instance, accurately notes many of the Secretary's cited "hire dates" from the driver files actually show such person's employment status as "pending." (Dkt. 31 at 14–15.)[16] Besides creating

_____

[16] Defendant mentions in its brief only those members with a "pending" status in the November 21, 2022 driver file. (Dkt. 31 at 15 n.3.) The Secretary downplays this point by saying the pending status applies to only a few members, the driver file still lists a hire date for that person, and those members, at the very latest, appeared on the November 30, 2022 employee change file. (Dkt. 32 at 5–6.) This argument lacks merit. At the outset, both parties understate how many prospective members had a pending status. By the Court's count, 21 of the supposedly

34

a dispute of fact on whether such person was "hired," a factfinder could view this ambiguous status as indicative of the unreliability of those files. Similarly, the driver files sometimes include information that changes weekly without explanation. As Defendant correctly notes, for example, the November 7, 2022 and November 21, 2022 driver files inexplicably change Shayla Smith's hiring date from November 7 to November 12, making her perhaps ineligible to receive a ballot even under the Secretary's theory. (*Compare* Dkts. 29-4 at 23, *with* 29-5 at 10.) And, contrary to the Secretary's suggestions otherwise (Dkts. 30-1 at 25; 32 at

---

disenfranchised members identified in the Secretary's summary chart were listed as pending in the driver filed cited by the Secretary in her chart: Edward Bailey, Tarrick Brown, Timothy Clark, Shane Clement, Louis Echevarria, Valjean Gibson, Miguel Guillen, Karen Hart, Flor Hernandez, Michelle Jones, Daynon Martin, Timothy McCauley, Janielle McField, Genaro Ortiz, Elicia Radabaugh, Patrick Roberson, Jacob Sampson, Shayla Smith, David Sweat, Eric Thornton, and Priscilla Williams. (The Court reached this determination by reviewing the driver file cited in the Secretary's summary chart for each employee listed in that chart.) This creates an issue of fact as to their employment status— a fundamental requirement under the new hire rule. The second argument misses the point because the issue is whether Defendant should've relied on the file at all, *not* whether a hire date exists in that file. And finally, even assuming all these members were listed on a later employee change file, the Secretary still has failed to produce evidence on the other essential requirement—submission of the membership applications. So the Court has no "independent basis" to count the members. (Dkt. 32 at 6.)

35

8), a factfinder could view Defendant's unwillingness to add new members based on the driver file not an "administrative failing" but a "reasonable step" to ensure accurate membership lists. So a genuine issue of material fact exists on whether Defendant should've used these files in the light of the noted deficiencies. *See Hodgson v. Loc. Union 582*, 350 F. Supp. 16, 19 (C.D. Cal. 1972) (weighing the "risks, complexities[,] and dangers" of the suggested action against "the 'over-all benefits to be gained'").

Finally, even if the Secretary demonstrated the listed members became eligible at the noted times, the Court could not say the resulting delay is unreasonable as a matter of law. Howard's process naturally includes some delay either from the time Defendant receives the information or when it processes new member applications. The Secretary's theory, however, tolerates little to no delay at either of these times. To be sure, consider one member the Secretary says was denied the right to vote: Kennyray Ainsley-Gilbert. The summary chart alleges Ainsley-Gilbert signed the membership application on October 29, 2022. (Dkt. 29-16.) The November 2022 employee change report shows Greyhound hired Gilbert on November 18, 2022. (Dkt. 29-19 at 1.) The

36

summary chart similarly shows Howard "initiated" the member's application on Monday, December 12, 2022—eleven days after Defendant compiled the voter eligibility list and the election ended. (Dkt. 29-16.) Under the Secretary's theory, however, Ainsley-Gilbert became eligible to vote on November 18, 2022—three days *before* Defendant even received that driver file and twelve days *before* it received the November 2022 employee change report. A factfinder could find unreasonable this demand for telepathic knowledge.

A careful parsing of the summary chart shows Ainsley-Gilbert is no outlier. Indeed, the Secretary, for instance, says Defendant denied well over half the supposedly listed members the right to vote by failing to mail them a ballot, despite evidence that Defendant had not received a notice of hiring until November 30, 2022—weeks after the November 7, 2022 ballot mailing deadline and a day before the election. (Dkt. 29-2 (interrogatories).)[17]   And the gap between when the Secretary says

---

[17] People within this category include Cierra Adepu, Timothy Clark, Shane Clement, Brianna De La Huerta, Pamela Glover, Miguel Guillen, Karen Hart, Craig Hill, Hamice James, Michael Keller, Eric Lewis, John Mankin, Daynon Martin, Genaro Ortiz, Patrick Roberson, Shayla Smith, David Sweat, and Radiance Woodruff. (Dkt. 29-16.)

someone became eligible to vote and when Greyhound notified Defendant of their hiring varies wildly. Sometimes, like for Adam Koecke, the Secretary says a listed member became eligible to vote 7 days before the relevant driver file and 22 days before the October 2022 employee change file arrived. (*Compare* Dkts. 29-16, *with* 29-12 (October 17, 2022 driver file), *and* 32-1 ¶ 30 (noting when Defendant received October 2022 employee change file).) Other times, as for Brianna De La Huerta, the Secretary contends a listed member became eligible to vote 3 days before the pertinent driver file and 26 days before Defendant received the November 2022 employee change file. (*Compare* Dkts. 29-16, *with* 29-4 (November 7, 2022 driver file), *and* 32-1 ¶ 32 (establishing Defendant received this employee change file on November 30, 2022).) Without citing any authority supporting her assumption, however, the Secretary affords Defendant no time to process or collect the applications. It thus appears the Secretary demands perfection. But that's not what section 481(e) requires. *Am. Postal Workers Union*, 486 F. Supp. at 83. A factfinder could view this demand for instantaneous knowledge unreasonable and Howard's natural delay reasonable.

Granted, the Secretary points to evidence (Defendant's judicial admission in its answer) generally noting Howard delays adding members even longer until Greyhound deducts dues from a prospective member's paycheck. (Dkts. 31-6 ¶¶ 28–29; 30-1 at 7–8; 32 at 11–12.) Defendant doesn't dispute the underlying fact that Howard waits until it starts collecting dues. (Dkts. 31-6 ¶¶ 28–29.) But, citing Local Rule 56.1, Defendant objects to the Court's consideration of a *separate* chart showing the delay between dues deduction and adding the member to the list. (Dkt. 31 at 10.) The Secretary has no consequential rebuttal. The Court agrees with Defendant for two reasons. First, to the extent the Secretary relies on this other chart in showing how Howard's practice contributed to the overall delay, the Court does not consider it because the Secretary cites that evidence only in her brief. Finally, even if the Secretary had properly cited this evidence, she has produced no authority suggesting Defendant unreasonably or improperly waited until it collected dues to add a member to the list. The Court thus disregards that other chart.

In all, absent some evidence suggesting the feasibility of such immediate knowledge, the Court cannot find, as a matter of law,

39

Defendant failed to take reasonable steps to secure each member's right to vote in the light of the disputed material facts.  So the Secretary's motion also fails for this independent reason.

## IV.   Conclusion

The Court thus **DENIES** the Secretary's Motions for Summary Judgment.  (Dkts. 21, 30.)

**SO ORDERED** this 5th day of September, 2025.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE